JAMES LI
P.O. Box 5399
7377 La Palma Ave.
Buena Park, Ca 90622
(626)322-5039
JAMES LI (SBA: 176662)

Attorney PLAINTIFF pro per

FILED
CLERK, U.S. DISTRICT COURT

APR 1 – 2016

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SA CV16-609- JVS (JC(5)X)

| | |
|---|---|
| James Li, | Case #: |
| **PLAINTIFF** | |
| Vs. | Complaint for Violations of Civil Rights |
| Wendy Chang, Cynthia Loo, Does 1-10, | |
| **DEFENDANT** | (1) Violation of Freedom of Speech |
| | (2) Violation of Freedom of Religion |
| | (3) Violation of Freedom of Speech |
| | (4) Violation of Freedom of Religion |

Demand for Jury Trial

Now comes the plaintiff James Li to file this complaint with the following allegations,

1. The jurisdictional bases for this action are 42 USC 1983, 42 USC 1988.

1

Li  v. Wendy Chang, et, al
Complaint for Violations of Civil Rights

2. Defendant Wendy Chang is an individual residing in Los Angeles County, and was the chairperson of the State Bar of California ("The State Bar") Committee On Professional Responsibilities And Conducts ("COPRAC") during the relevant time stated herein.

3. Defendant Cynthia Loo  is an individual residing in Los Angeles County, and was the chairperson of the California State Bar Council on Access and Fairness ("CAF") during the relevant time stated herein.

4. The plaintiff is informed and believes based upon such information that Defendants Does 1-10 are or were agents of The State Bar, with Does 1-5 associated with COPRAC and Does 6-10 associated with CAF, who are jointly and severally liable for injury to the plaintiff because their actions, individually or collectively, were substantial causes of the plaintiff's injury, and Does 1-10's identities are unknown to the plaintiff and will be identified when known.

5. The plaintiff is an Orange County resident, was an applicant to COPRAC and CAF, and was an active member of the State Bar.

6. The State Bar publicly claims itself to be a judicial agency "protecting the public and enhancing the administration of justice", and to value diversity[1].

7. The State Bar also publicly claims to value diversity in the appointments to various committees and councils[2].

---

[1] As evidenced by its establishment of a Diversity Award in 2001, and encourage young people from the disadvantaged backgrounds to enter the legal profession, as evidenced by its establishment of an Education Pipeline Award in 2008.

[2] As evidenced by the following claim in its form application to committee appointments,

2

Li  v. Wendy Chang, et, al
Complaint for Violations of Civil Rights

8. The plaintiff is as unlikely a member of the American legal profession as it gets, having dropped out of both elementary school and high school as a result of confluence of historical circumstances and financial hardships, needing to do something heroic, i.e., making a direct contribution to the struggle for racial equality in the last century, to overcome those disadvantages to continue to have a realistic opportunity for a public school education, and getting admitted to both college and UCLA Law School through large affirmative action preferences. See the plaintiff's application to the State Bar, attached as Exhibit 7.

9. As an attorney, in the past 10 years, the plaintiff has demonstrated the value of diversity to the legal profession in a dramatic way not likely to be repeated in the near future, single-handedly triggering a national Asian-American rebellion against an evolution by the first African-American president and likely the first female president of the United States, with information available in the Los Angeles County Public Library.

10. The plaintiff accomplished his feat by publicly turning the argument by this country's growing, expanding Chinese-American political, legal and legal academic establishments that it was consistent with past Chinese-American experiences, civil rights struggles and present Chinese-American conscience and interests to compare same-sex marriage to

> The State Bar of California values diversity and broad-based representation in its appointments. The legal community is diverse and it serves an even more heterogeneous population. The recruitment and selection of applicants with diverse backgrounds, experiences, outlooks, and ideas will bring qualities essential to the governance of the legal profession and to the services the State Bar provides to its diverse members and to the public. It is therefore the policy of the State Bar's Board of Trustees to encourage the participation of all State Bar members in order to obtain broad representation on each entity. To the extent available, the State Bar will consider factors which encourage breadth and depth of perspective including, but not limited to, the following: geographic location of residence and work, practice area, size of law practice, length of time practicing, volunteer work, specific accomplishments, educational background, ethnicity, gender, age, sexual orientation, and disability. The State Bar provides equal access to all applicants and complies with all applicable anti-discrimination laws in its appointment process.

Li  v. Wendy Chang, et, al

Complaint for Violations of Civil Rights

interracial marriage on state and federal constitutional grounds (hereinafter, the "APALC[3] Argument" to correspond to the source of the plaintiff's first knowledge of the argument's being seriously made by an Asian-American legal establishment) on its head.

11. From the internet and various Southern California public libraries, the plaintiff gathered evidences from diverse sources, glued by contemporary New York Times and Los Angeles Times reports of historical events[4], to present a powerful mosaics of a profound dimension of Chinese-Americans' compelling present interest in a culture of respect for the will of the governed on social issues[5], and that it is much more American, more Chinese and more Chinese-American for Chinese-Americans to contribute to cultivate a culture of respecting people's will on social issues rather than undermine it through participating in using concepts conceived to protect African-Americans to undercut African-Americans' right to vote in the name of marriage equality for gay people[6].

12. In the process, the plaintiff publicly demonstrated that the APALC Argument had been biased by inadequate knowledge of depth and breadth of past and present Chinese-American experiences, isolation from the Chinese immigrant communities, outdated, old Chinese-American politics about historical events in Chinese history for the past 100 years, and lack of bilingual ability to recognize the argument's own biases.

13. The plaintiff's works, propogated through e-mails to Southern California Chinese-American legal community, have impacted the entire national Asian-American

---

[3] The initialism for Asian Pacific American Legal Center", now known as "Asian-American Advancing Justice—Los Angeles")

[4]      Several representative newspaper articles are attached as Exhibit 1.

[5]      The plaintiff has publicly pointed out for a long time that a person from Taiwan or Hong Kong with any common sense can just look at the map of China to realize that he or she should not take part in weakening a culture of respecting the will of the governed.

[6]  It is a well known fact that the voided California law limiting definition of marriage to one man and one woman resulted from a people's proposition with winning margin resulting directly from majority support of African-American voters.

4

Li  v. Wendy Chang, et, al
## Complaint for Violations of Civil Rights

communities as a result of America's melting pot effect on Asian-American communities, and those impacts can be detected in the records of the California Supreme Court and the U.S. Supreme Court, showing actual massive retreat by Asian-American organization from supporting voiding people's will on same-sex relationships over time, even as the movement to constitutionalize same-sex marriage gained increasing momentum[7], and the dearth of celebration by Chinese-American law professors of the US Supreme Court's decision to constitutionalize same-sex marriage[8].

14. Plaintiff's works publicly turning APALC Argument on its head may very well be used as a case study in the future why judges should not be trusted to legislate on the bench on social issues because lawyers, from whom judges are selected, do not know everything, and what they do know have been biased by privilege and isolation.

15. Before using historical and sociological evidences widely available in the Southern Californian public libraries to turn APALC Argument on its head, the plaintiff had openly challenged whether the APALC Argument had overlooked many aspects of the Chinese-American experiences and questioned whether the argument's Chinese-American lawyer-proponents had been motivated by politics in addition to apparent oversights of aspects of the Chinese-American experiences[9].

---

[7]    In a 2007 amicus curiae brief, apparently written by a mostly if not all Chinese-American attorneys, in support of California Supreme Court recognizing a right to same sex marriage under the California constitution, Southern California Chinese Lawyers Association ("SCCLA") and 2 other Chinese American organizations, Korean-American Bar Association of Southern California and 4 Korea American organization, and Vietnamese American Bar Association of Northern California appeared as amici. In a 2013 amicus curiae brief, authored by one Jerome Cohen, in support of the U.S. Supreme Court requiring California to recognize same-sex marriage under the U.S. Constitution, National Asian Pacific American Bar Association ("NAPABA") signed on as an amicus. In the 2015 briefs filed in support of the U.S. Supreme Court's ultimate decision requiring states to recognize same-sex marriage, no Chinese-American, no Korean-American, and no Vietnamese American bar association or community organizations, nor NAPABA signed on any brief.

[8]    As one example, one can google about Professors Robert Chang, Nancy Leong and Frank Wu.

[9]    See Exhibit 2 attached.

5

Li  v. Wendy Chang, et, al
Complaint for Violations of Civil Rights

16. Plaintiff also protested at being retaliated at Southern California Chinese Lawyers Association ("SCCLA")[10], protested against unauthorized, unratified exaggeration to the California Supreme Court in the name of Southern California Chinese Lawyers Association, and coined the joke "SCCLA is not the abbreviation for Society of Crooked Chinese Lawyers of America" to express his outrage of being associated with a purported collective support to something intellectually untenable and morally offensive on multiple fronts to him[11].

17. To support the points made in his various challenges and protests, the plaintiff began using the internet to document aspects of the Chinese American experiences apparently overlooked by APALC Argument supporters and the fact that Chinese people and immigrants in the past 40 years have experienced an awakening about their heritage and its linkage to the people of Taiwan through various Chinese language media.

18. Each time the plaintiff found some thing on the internet to support his points, he shared it through e-mail to a list of people associated with SCCLA so that it would be available to be shared with others, knowing the many Chinese-Americans have multiple racial and ethnic identities and have relatives who do because of high Asian-American inter-marriage rates, often times along with a satirical remark about the apparent lack of insight about a profound dimension of present Chinese-American interest in a culture of honoring the will of the governed by the very Chinese-American lawyers and politicians who benefit the most from the existence of such an interest both for interesting readers to give attention his e-mails and stipulating deeper reflection about APALC Argument.

19. The plaintiff's works, protests and advocacies were all related to issues of compelling public concern, i.e., more generally, whether people have a right to control the pace of social change, such as recognizing gay marriage, and more specifically, how Chinese-

---

[10]   See Exhibit 3 attached.

[11]   See Exhibits 4 and 5 attached.

6

Li  v. Wendy Chang, et, al
Complaint for Violations of Civil Rights

Americans should side in that debate in light of political, historical and sociological circumstances uniquely faced by Chinese-Americans.

20. Defendants Wendy Chang and Cynthia Loo were aware of the plaintiff's works, protests and advocacies because they have been closely associated with SCCLA, with Wendy Chang being a purported former President of SCCLA, and Cynthia Loo, a daughter of a founding member of SCCLA.

21. By 2013, the effects of plaintiff's works had already triggered a massive retreat of Asian-American support for overturning Proposition 8 (the voter initiative to limit definition of marriage to a man and a woman), as evidenced in the disappearance of Chinese-American, Korean-American, and Vietnamese-American organizations in the amicus briefs supporting overturning Proposition 8 under the U.S Constitution.

22. In 2014, out of consideration that most Chinese-American lawyers on his list of e-mails might not be able to understand information written or spoken entirely in Chinese, the plaintiff went to the Los Angeles County Public Library and Newport Beach Public Library to download contemporary New York Times and Los Angeles Times reports of events corroborating the stories of the Chinese people and Chinese-Americans that have been widely available in the Chinese immigrant communities and apparently overlooked by many Chinese-American politicians and attorneys because of their lack of bilingual ability, de facto isolation from Chinese immigrant communities, and/or just being too busy at their individual professional callings.

23. The plaintiff's ability to glue together with contemporary New York Times and Los Angeles Times reports various disjointed sources forming a clear mosaic of a profound dimension of present Chinese American interest in a culture of respect for the will of the governed on social issues likely enabled the plaintiff to have emerged as the most effective Chinese-American voice for civil rights (i.e., people's rights to participate in the

Li  v. Wendy Chang, et, al
### Complaint for Violations of Civil Rights

political process being much more precious, at least to Chinese-Americans, than gay people's right to have same-sex) in the California legal community[12].

24. In 2013 and 2014, the plaintiff, in response to State Bar's claims about being committed to diversity and to value input from bar members from diverse background, the plaintiff applied to serve on the State Bar's Council for Access and Fairness ("CAF"), the Committee on Professional Responsibility and Conduct ("COPRAC"), and the Committee on Administration of Justice.

25. In his application to serve on a State Bar's committees and/or council, the plaintiff proudly listed, as a component of his qualification, his success at causing or contributing some Asian-American bar associations' decision to distance themselves from supporting judicially overturning Proposition 8 on federal constitutional grounds, notwithstanding the increasingly prevailing political current for comparing sexual-orientation discrimination to race discrimination on constitutional grounds.

26. In his application, the plaintiff directly attributed his ability to see issues overlooked by the Chinese-American political, legal and legal academic establishments as a result of his upbringing and life experiences that were very different from the typical American attorney.

27. In his application, in response to question about his ability to contribute to diversity in State Bar committees, the plaintiff acknowledge that his challenge to APALC's Argument had also been privately motivated by his own religious belief, though all his public arguments had been based on historical and sociological evidences.

28. Notwithstanding the plaintiff's contribution to enlighten the meaning of civil rights to the legal community and demonstration that people of color from disadvantaged background

---

[12] A claim that is backed up by the massive retreat by Asian American organizations from being associated to the amicus briefs supporting overturning same-sex law in 2015, as Chinese-American political, legal, and legal academic establishment could not answer the plaintiff's question, "Where is the evidence of Chinese-Americans ever complained about marriage restriction?".

8

Li  v. Wendy Chang, et, al
## Complaint for Violations of Civil Rights

are capable of independent thinking and successful challenge to the apparent prevailing view of the legal establishment, the plaintiff's application was rejected.

29. Although all the positions applied by the plaintiff were voluntary positions, appointment to any of those positions has significant economic values, especially to a solo practitioner like the plaintiff.

First Cause of Action

(Violation of 1st Amendment Right to Free Speech)

30. The plaintiff incorporates the above allegations as if fully alleged herein.

31. Plaintiff's works at overturning APALC's argument were both protected political speech and protected speech to serve the public interest, protected by the 1st Amendment to the U.S. Constitution, made applicable to the states through the 14th Amendment.

32. In evaluating his application, defendant Wendy Chang, and defendants Does 1 to 5, acting either independently or in concert, used their positions as officials of the State Bar to retaliate against the plaintiff for his exercise of civil rights through rejecting his application to COPRAC, in defiance of U.S. law, and in defiance of State Bar policy.

33. As a result, the plaintiff suffered damage according to proof.

Second Cause of Action

(Violation of 1st Amendment Right to Religious Freedom)

34. The plaintiff incorporates the above allegations as if fully alleged herein.

35. Plaintiff's works at overturning APALC's argument were both protected political speech and protected speech to serve the public interest, protected by the 1st Amendment to the U.S. Constitution, made applicable to the states through the 14th Amendment, and acted also out of conscience arising from his religious belief.

9

Li  v. Wendy Chang, et, al

Complaint for Violations of Civil Rights

36. In evaluating his application, defendant Wendy Chang, and defendants Does 1 to 5, acting either independently or in concert, used their positions as officials of the State Bar to retaliate against the plaintiff for his exercise of civil rights, including freedom of religion through rejecting his application to COPRAC, in defiance of U.S. law, and in defiance of State Bar policy.

37. As a result, the plaintiff suffered damage according to proof.

Third Cause of Action

(Violation of 1st Amendment Right to Free Speech)

38. The plaintiff incorporates the above allegations as if fully alleged herein.

39. Plaintiff's works at overturning APALC's argument were both protected political speech and protected speech to serve the public interest, protected by the 1st Amendment to the U.S. Constitution, made applicable to the states through the 14th Amendment.

40. In evaluating his application, defendant Cynthia Loo, and defendants Does 6 to 10, acting either independently or in concert, used their positions as officials of the State Bar to retaliate against the plaintiff for his exercise of civil rights through rejecting his application to CAF, in defiance of U.S. law, and in defiance of State Bar policy.

41. As a result, the plaintiff suffered damage according to proof.

Fouth Cause of Action

(Violation of 1st Amendment Right to Religious Freedom)

42. The plaintiff incorporates the above allegations as if fully alleged herein.

43. Plaintiff's works at overturning APALC's argument were both protected political speech and protected speech to serve the public interest, protected by the 1st Amendment to the

Li  v. Wendy Chang, et, al
Complaint for Violations of Civil Rights

U.S. Constitution, made applicable to the states through the 14th Amendment, and acted also out of conscience arising from his religious belief.

44. In evaluating his application, defendant Cynthia Loo, and defendants Does 6 to 10, acting either independently or in concert, used their positions as officials of the State Bar to retaliate against the plaintiff for his exercise of civil rights, including freedom of religion through rejecting his application to CAF, in defiance of U.S. law, and in defiance of State Bar policy.

45. As a result, the plaintiff suffered damage according to proof.

Plaintiff demands jury trial and prays,

1. Economic damage against defendants according to proof,

2. Non-economic damage against defendants according to proof,

3. Punitive damage against defendants against defendants according to proof, and

4. Other relieves deemed appropriate by the court.

Dated: March 4th, 2015

_____

James Li, Pro Per

11

Li  v. Wendy Chang, et, al

Complaint for Violations of Civil Rights

CHINA'S STAND FIRM ON THE 21 DEMANDS: Dr. Wang States at Final ...
Special to The New York Times.
*New York Times (1857-1922);* Feb 4, 1922;
ProQuest Historical Newspapers: The New York Times (1851-2010)
pg. 2

# CHINA'S STAND FIRM ON THE 21 DEMANDS

## Dr. Wang States at Final Committee Session Reasons Why They Should Be Re-examined.

### Special to The New York Times.

WASHINGTON, Feb. 3.—The final session of the Committee on Pacific and Far Eastern Questions today adopted the Nine-Power Treaty to stabilize conditions in the Far East, completing the last of the treaties before the conference.

After this, the Twenty-one Demands, which were before the committee yesterday, were brought up by Dr. Wang, replying to the offer of Baron Shidehara of three modifications in the demands, including withdrawal of Group V.

Dr. Wang expressed pleasure over the offer and regretted that Japan did not volunteer to renounce the other claims set up in the treaties and notes of 1915. After reviewing the events that led up to the presentation of the Twenty-one Demands and the results thereof, Dr. Wang said:

"Because of the essential injustice of these provisions, the Chinese delegation, acting in behalf of the Chinese Government and of the Chinese people, has felt itself in duty bound to present to this conference, representing the powers with substantial interests in the Far East, the question as to equity and justice of these agreements and therefore as to their fundamental validity.

"If Japan is disposed to rely solely upon a claim as to the technical or juristic validity of the agreements of 1915, as having been actually signed in due form by the two Governments, it may be said that so far as this conference is concerned, the contention is largely irrelevant, for this gathering of the representatives of the nine powers has not had for its purpose the maintenance of the legal status quo.

"Upon the contrary, the purpose has been, if possible, to bring about such changes in existing conditions upon the

Pacific and in the Far East, as might be expected to promote that enduring friendship among the nations of which the President of the United States spoke in his letter of invitation to the powers to participate in this conference.

### Reasons for Asking Abrogation.

"For the following reasons, therefore, the Chinese Delegation is of the opinion that the Sino-Japanese treaties and exchange of notes of May 25, 1915, should from the subject of impartial examination with a view to their abrogation.

"1. In exchange for the concessions demanded of China, Japan offered no 'quid pro quo.' The benefits derived from the agreements were wholly unilateral.

"2. The agreements, in certain respects, are in violation of treaties between China and the other powers.

"3. The agreements are inconsistent with the principles relating to China which have been adopted by the conference.

"4. The agreements have engendered constant misunderstandings between China and Japan, and, if not abrogated, will necessarily tend, in the future, to disturb friendly relations between the two countries, and will thus constitute an obstacle in the way of realizing the purpose for the attainment of which this conference was convened. As to this, the Chinese delegation, by way of conclusion, can, perhaps, do no better than quote from a resolution introduced in the Japanese Parliament in June, 1915, by Mr. Hara, later Premier of Japan, a resolution which received the support of some 140 members of Parliament. The resolution reads:

Resolved, That the negotiations carried on with China by the present Government have been inappropriate in every respect; that they are detrimental to the amicable relationship between the two countries, and provocative of suspicions on the part of the powers; that they have the effect of lowering the prestige of the Japanese Empire, and that, while far from capable of establishing the foundation of peace in the Far East, they will form the source of future trouble.

"The foregoing declaration has been made in order that the Chinese Government may have upon record the view which it takes, and will continue to take, regarding the Sino-Japanese treaties and exchange of notes of May 25, 1915."

### Hughes States Our Position.

Secretary Hughes then explained the position of the United States in refer-

ence to Japan's attitude toward China as embraced in the twenty-one demands, quoting the note sent by the American Government to Japan on May 13, 1915. He said that this note was in accord with the historic policy of the United States.

Reviewing the Twenty-one Demands, Mr. Hughes said that Group I had been wiped out by the settlement of the Shantung issue and that Group V would not be pressed, while many of the rigid features in the other demands had been modified by Japan's offer made yesterday through Baron Shidehara.

Concerning the express statement of Japan's readiness not to insist upon the right of option, granted exclusively in favor of Japanese capital with regard to loans for the construction of railroads in South Manchuria and Eastern Inner Mongolia, and loans secured on the taxes of those regions, but to throw them open to the joint activity of the international consortium, Mr. Hughes remarked:

"It is doubtless the fact that any enterprise of the character contemplated which may be undertaken in these regions by foreign capital would in all probability be undertaken by the consortium. But it should be observed that existing treaties would leave the opportunity for such enterprises open on terms of equality to the citizens of all nations. It can scarcely be assumed that this general right of the treaty powers in China can be effectively restricted to the nationals of those countries which are participants in the work of the consortium, or that any of the Governments which have taken part in the organization of the consortium would feel themselves to be in a position to deny all rights in the matter to any save the members of the respective national groups in that organization. I, therefore, trust that it is in this sense that we may properly interpret the Japanese Government's declaration of willingness to relinquish its claim under the 1915 treaties to any exclusive position with respect to railway construction and to financial operations secured."

Secretary Hughes here noted that the treaty rights between China and Japan were distinct from the question of the treaty rights of the United States under its treaties with China.

He concluded:

"I may say that it is with especial pleasure that the Government of the United States finds itself now engaged in the act of reaffirming and defining, and I hope, I may add, revitalizing, by the proposed Nine-Power Treaty, these policies (the open door and equality of all nationals) with respect to China."

At the suggestion of Mr. Hughes the speeches bearing on the Twenty-One Demands will be spread on the proceedings of the conference, the Chinese delegates reserving the right to seek a solution of the questions on future occasions.

1-1

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# LAMONT SAYS CHINA MUST GIVE UP CULT

## Ancestor Worship an Obstacle to Progress of the Nation, He Asserts.

### BIG GAINS AT WASHINGTON

#### Return of Shantung of Tremendous Importance to the Chinese, Banker Declares.

The Chinese must give up their cult of ancestor worship if they are to take advantage of all the benefits which accrue to them from the conference at Washington, according to Thomas W. Lamont of the firm of J. P. Morgan & Co., the organizer of the fight on the famine in China a year ago and one of the leading authorities on that country in the United States.

The Chinese have the capacity, the industry and the character to make themselves a progressive modern nation, according to Mr. Lamont, but are obstructed in their progress by the lengths to which they carry forefather worship, which now influences most of their acts. On his recent visit to China, Mr. Lamont said that one far-sighted Chinese to whom he talked thought that the prospect of making a great and prosperous nation of China lay in the substitution of Christianity for Confucianism.

Mr. Lamont said that the gains made by the Chinese at Washington were enormous. While he praised the Japanese, he also mentioned the Chinese boycott of Japanese goods as a factor in the conciliatory attitude of Japan.

"No one can exaggerate the tremendous importance of the return of Shantung to the Chinese," he said. "We have heard of the matter for many months. It probably played its part in defeating the Treaty of Versailles in the Senate. So much had been said of it that when the Japanese agreed to return it is was passed over in the newspapers rather lightly.

"But no one who has been in China recently could fail to realize the vital significance of this question. The news will be received with relief and delight beyond measure in China. The tremendous boycott against Japan, started by Chinese students, swept the whole country, and its effect on Japan was very unfavorable. This agreement now puts Japan out of the class of nations that need to be boycotted."

The right gained by China to raise tariffs on imports will be of tremendous advantage to China, Mr. Lamont said, in enabling China to secure loans for much-needed railroads. Recent charges that the Chinese people were in a state of disorder were denied by him.

"There is no more orderly community than China in the world," he said. "The Government is disorderly, but the people are orderly. For instance, there were 23,000 arrests in Peking in one year—not so many considering the great size of its population—and of these only 345 were for a breach of the peace. That will indicate pretty well the orderly conduct of the citizens of China.

"The Chinese are a great, honest, frugal, industrious people, who love peace, who love their families and who are moving on toward the light and are looking to us every moment for help."

Mr. Lamont said that no nation in the world's history had ever done one-tenth as much for China as the United States had a year ago in coming to her assistance in fighting the famine there. He said that the promptness and effectiveness of the work was largely due to John D. Rockefeller Jr., who not only gave a large sum himself, but underwrote expected contributions, thus enabling the commission to spend in the Spring money which was not actually subscribed until later.

"Few things have stirred the Chinese so much," he said, "as the great buildings of the Rockefeller medical centre, going up in the centre of Peking, to be the focus of medical education, sanitation and health for 400,000,000 people."

After extolling the vigor, patience and kindness of the Chinese character, he added:

"But the practice of ancestor worship, as it is carried on today, must change if China is to come into her own."

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

CHINA AND JAPAN PRAISE TREATIES: President Hsu Shih Chang, Minister ...

# CHINA AND JAPAN PRAISE TREATIES

### President Hsu Shih Chang, Minister Sze and Baron Kato Express Thanks to America.

## CLOUDS IN FAR EAST LIFTED

#### Chinese Organizations Promise to Complete Shantung Railway Payment Within Five Years.

*Special to the New York Times.*

WASHINGTON, Feb. 3.—

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# Chinese Hold Moon Festival

## Dragon and Lion Parade Before 25,000 Spectators

Clashing gongs and cymbals sounded old Chinatown's welcome to 25,000 Southern Californians last night for the moon festival, China's greatest ancient celebration.

Gum Lung, a 1000-foot golden dragon filled with 100 men, wound its tortuous way through Los Angeles street south of the Plaza.

The eerie-lighted dragon, owned by Chen Bong-yen of Sacramento, is symbolic of the god of rain and twists along in supplication for a shower of blessings and mercy.

### GIANT LION MARCHES

Sze Gee, the giant lion representing courage and power, fought through the throngs on the roped-off streets.

Pretty Chinese girls rode in a grotesque dragon boat, seeking to appease the wrath of the dragon on the fifteenth day of the eighth moon in the Chinese calendar.

Chinese legend demands worship of the moon goddess during the grain harvests. The festival will continue tonight.

### FUND FOR REFUGEES

The Chinese Consolidated Benevolent Association sponsors the celebration to raise funds for millions of civilian refugees in China.

Little children wearing placards reading, "Help Save a Child's Life," solicit donations. Fraternal halls and tong houses are open to the public. Anna May Wong and Soo Yong, film actresses, join with other Chinese in pageantry, music and dancing on the lantern-filled streets.

# Bay City Strike Mediators Busy

SAN FRANCISCO, Oct. 8. (AP)—Behind closed doors today mediators worked for peace in labor disputes involving 7500 idle workers—C.I.O. warehousemen and striking A.F.L. department-store clerks.

Mayor Rossi's committee of ten recessed its settlement-seeking conference today in the strike of thirty-five department stores for the week-end, but hinted at the possibility it might call workers' and employers' representatives into its session Monday.

The committee was expected to ask the representatives to give their reactions to peace proposals advanced Friday.

The union, meanwhile, announced signing of contracts with six stores employing 100 workers.

Demand of the Association of San Francisco Distributors for an industry-wide "master" contract covering about 130 closed warehouses continued to engage Paul C. Smith, youthful general manager of the San Francisco Chronicle, who acceded to a union invitation to mediate the dispute.

# CREDITORS ACT AGAINST WIDOW

## Debts of $2882 Laid To Rogers's Ex-Wife

NEW YORK, Oct. 8. (AP)—Four creditors filed a petition in bankruptcy today against Mrs. Marguerite Basil Miles, former wife of the late Col. Henry H. Rogers, heir to an oil fortune estimated at $26,000,000, when he died in 1935.

Claims of the creditors totaled $2882 for clothing, furs and flowers which they said she bought in 1937 and 1938. One florist's bill was for $873.

Mrs. Miles, widow of Basil Miles, American administrator of the International Chamber of Commerce in Paris, married Col. Rogers in Switzerland in 1929. She obtained an uncontested divorce in Reno in 1933, charging cruelty.

### G.A.R. Women to Meet

The Women's Relief Corps, an auxiliary of the G.A.R. Robley D. Evans Post No. 120, will meet at 1 p.m., Tuesday at Patriotic Hall.

1-4

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

War Ambulance Replaces Dragon In Chinatown New Year Parade: Thousands ...
New York Times (1923-Current file); Feb 20, 1939;
ProQuest Historical Newspapers: The New York Times (1851-2009)
pg. 14

# War Ambulance Replaces Dragon In Chinatown New Year Parade

## Thousands See Celebration That Emphasizes Grim Spirit of Modern China—$30,000 Raised for Cars to Carry Wounded

The fanciful splendor of the Chinese dragon was missing in Chinatown yesterday in the celebration of the Chinese New Year. In its place moved a motor ambulance of the type that Chinese merchants of this city have been sending to their homeland to aid in the fight against the Japanese.

Several thousand visitors crowded the narrow streets of the settlement as the New Year's Day parade, including the ambulance, banners of many colors and 200 costumed "Boxers," armed with swords and spears, wound back and forth for several hours through Chinatown. It was the beginning of the lunar year 4643 in the Chinese calendar (though there has been some dispute over the date), and also marked the end of the twenty-eighth year of the Chinese Republic.

As was the case last year, the celebration emphasized the grim spirit of a modern China in distress. Gifts of money that formerly had been dropped from windows in red-paper packages to be given to children were tossed this year into a huge Chinese flag for a fund to send ambulances to China. Franklin Wong, president of the Chinese Benevolent Association, estimated that contributions before and during the parade would total $30,000.

As the parade moved solemnly through the short-bannered streets, children popped firecrackers from the sidewalks, while many of their elders gathered around the outdoor bulletin board to read the latest news from China. Silk streamers of many colors, but with red predominating, fluttered from rooftops, open windows and balconies, to form a brilliant canopy over the parade.

A large American flag was borne with a Chinese flag at the head of the parade. Behind the flags a detachment of Chinese Boy and Girl Scouts marched with eyes straight ahead. Behind them a new buff-colored stream-lined ambulance rolled, followed by marchers bearing banners on which money collected before the celebration had been pinned. The Chinese flag was lowered during the parade and gifts of money were thrown into its folds.

A touch of fantasy was shown in a marching cloth lion with two men inside, and the ceremonial dance of the "Boxers." As the parade ended the "Boxers" faced each other with raised spears and performed a warrior ceremony that linked the symbolism of centuries ago with the modern spirit of China today.

1-5

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

CHUNGKING AID SOUGHT: Chinese Children Collecting Funds for Bomb Victims
New York Times (1923-Current file); May 10, 1939;
ProQuest Historical Newspapers: The New York Times (1851-2009)
pg. 12

# CHUNGKING AID SOUGHT

## Chinese Children Collecting Funds for Bomb Victims

More than one hundred Chinese boys and girls yesterday began to collect money throughout the city for the relief of victims of the recent bombings of Chungking, China, by the Japanese air forces.

They took up posts with canisters in Wall Street, Fourteenth and Thirty-fourth Streets and in Times Square.

The drive, started by the General Relief Fund Committee of the Chinese Consolidated Benevolent Association, began on the Chinese Humiliation Day, the anniversary of Japan's twenty-one demands. It will close with ceremonies for the dead on Sunday.

The committee headquarters is at 47 Mott Street. Franklin Wong, president of the association, is chairman of the relief committee.

1-6

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Wednesday, November 16, 2005 7:52 PM

Hi, [         ] and every one,

  Although I am not a board member, because I am a
first generation immigrant and work with other first
generation Chinese-Americans and immigrants on daily
basis,  I indulge myself to think I may have a
perspective useful for the deliberation of the gay
marriage issue in the upcoming SCCALA meeting.

  First, as a legal matter, the request for judicial
invalidation of the law not recognizing gay marriage
is most likely to be a lost cause.  The California
Supreme Court case invalidating anti-interracial
marriage law, Perez v. Sharp, 32 Cal 2nd. 711, is
totally distinguishable, because it was decided on the
ground of 14th Amendment Equal Protection clause,
which was enacted to protect blacks and protect
against race discrimination.  Sexual orientation is
simply a classification not subject to strict
scrutiny, and as such any rational basis is a groud
for validating the law not recognizing gay marriage.
Moreover, Perez v. Sharp opinion is clear that the
court should defer to legislature in its exercise of
police power on issue of regulation of marital
relationship--unless the issue of race is involved.

  Second, as a sociological matter, based on anecdotal
evidence, I estimate at least 80 of first general
Chinese-Americans find gay marriage offensive.

  Third, as a policy matter, a judicial invalidation
of law prohibitiong gay marriage may actually harm
liberty rather than advance it.  The concept of check
and balance was conceived as an important guarantee of
liberty, and has served this country well.  The law
not recognizing gay marriage is a choice made by the
people.  An argument to invalidate this law is an
argument to curtail the power of the people to
participate directly in the democratic process, and
this kind of argument should not be made lightly.  If
a judge can invalidate the law against gay marriage,
what will stop a judge to invalidate law against
poligamist marriage?  Against incestral marriage?  And
for that matter, against any law founded on community
notion of morality against a conduct where there is no
victim, such as prositution and drug use?

  Fourth, if SCCALA goes on the record as supporting
the legal challenge against the will of people--and a
legal challenge that will most likely fail for the
reasons stated above, SCCALA will lose credibility on
future issues that are of more direct concern to
Chinese immigrant communities, such as human rights in
China, indepedence movement in Taiwan, and a humanity

2-1

and political crisis likely to occur in the
Chinese-American communities if Mainland China decides
to use force to sniff out Taiwan independence
movement--a possibility that is not so remote now that
U.S. has its hands all tied up in Iraq.  The
adversaries of SCCALA's position on these issues of
great concern to Chinese communities will have a
weapon to argue that SCCALA does not believe in the
wisdom of the common people: "See, SCCALA in 2005
supported an argument for one person to overturn the
will of the people."

  In sum, I believe that it is a big mistake for
SCCALA to sign on the amicus brief--especially for a
legal position that is likely to be rejected by the
California Supreme Court.

  I hope that I am pitching in constructive input, and
certainly welcome any rebutal argument.  Thank you for
your attention.

James Li

_____
Yahoo! FareChase: Search multiple travel sites in one click.
http://farechase.yahoo.com

2-2

Sunday, November 27, 2005 4:40 AM

Hi, [     ] and every one,

Ten days ago, I listed four arguments against SCCALA
signing on the amicus brief affirming a San Francisco
judge's overturning the will of the people as
expressed in Proposition 22, I have since identified
two additional arguments based upon reflecting Chinese
history and Chinese-American history:

1.  Supporting invalidating the will of the people
by one or several men in black ropes over an issue not
involving rights fundamental to the American people is
incongruous to the aspiration, struggle and sacrifice
of the Chinese people in the past 100 years.

2.  Supporting invalidating the will of the people
over an issue not involving rights fundamental to the
American people is incongruous of the Chinese
immigrant experience and Chinese-American heritage.

As an organizing existing to serve the interest of
Asian-Americans, and Chinese-Americans in particular,
I am confident that every one can agree that SCCALA
should not act in a way that is incongruous with the
Chinese-American experience.  Unlike the
African-American experience, all first generation
Chinese immigrants to this country came on their free
will after weighing the cost and benefits of such an
action.  As such the Chinese-American experience is
shaped to a large extent by the aspiration and
struggle of the Chinese people. Which one of us is not
a descendant of direct or indirect refugees of the war
between China and Japan from 1937 to 1945 and the
Chinese civil war that has never ended and may yet
turn into another shooting war?  And for that matter,
most of the Chinese-Americans are either themselves
direct or indirect refugees of those two wars that
engulfed the entire Chinese nation and population or
their descendants.

The Sino-Japanese war and the Chinese civil war of
last century, together costing at least 50 million
Chinese lives, are directly related to same-sex
marriage issue now before us.  Historians may disagree
on many things, but they all agree that a but-for
factor for those two wars is that in the spring and
summer of 1919, the Chinese people spontaneously
expressed their collective will in the only way they
could, demonstrating on the streets of their cities,
to their government that they would prefer to face war
with Japan and all of its consequences over peace with
shame, and demanded their government to withdraw from

2-3

a series of signed or being-signed treaties that collectively would practically turn China into a province of Japan.

The Chinese people paid a very dear price for being able to determine for the first time through a rudimentary grass-root democratic process their identity and characters as a people.  The sole purpose of Japan's war of aggression against China in the 1930s and 1940s was to bend the will of the Chinese people through terror and occupation, to gain through aggression what it had obtained from China's national leader by the Spring of 1919 but lost by the Summer of 1919 because the Chinese people collectively expressed through street demonstrations their will that they preferred to be invaded by and fight against a militarily superior Japanese army than being second-class subjects of Japan.  But for the fact that the American people stood up for the Chinese people, the Chinese people probably would have to endure much greater sacrifice for being able to express their collective will over a policy decision of their leader.

Historians of China will also agree that the dramatic altering of the character and escalation of the Chinese civil war with its outcome in mainland China and its ongoing consequences that every Chinese and every Chinese-American today has to live with is a direct result of Japan's aggression toward China after the ordinary Chinese people for the first time in their history and the only time at a national level used the most rudimentary democratic process to veto their national leader's decision to have them to live in peace with shame.

Unfortunately, for all the struggle and sacrifice the Chinese people have had to endure in the past 100 years, with the exception of Taiwan and conceivably at a much limited degree also Hong Kong, today the Chinese people still can only aspire for what the American people take for granted: being able to participate directly in the process of governing themselves.

As a related point about the Chinese American experience, even in the dark days when Chinese living in America and Chinese-American were subjected to all types of discrimination, America was a desired destination for many Chinese.  Why? Because under the American system of government, even in the bad old days, there was enough room for a combination of liberty, stability and prosperity and prospect for future improvement for our forbearers to justify leaving behind their families to journey half the way around the world to come to this country.  And that

2-4

combination of enough room for liberty, stability, prosperity, and prospect for future improvement would not have been possible but for a system of check and balance passed to us by the forbearers of this country.  A very important component of that system of check and balance is that the citizens have control over the police power of the state through referendum.

With the above historical reference as starting points, let us examine the same-sex marriage issue from a broader cultural and historical perspective. The people of California collectively expressed their will on whether to recognize same-sex marriage.  For a single judge to overturn the will of the people on this issue is simply terrible precedent for curtailing the right of the people to directly participate in the political process, and represents a major shift in the system of check and balance away from the people.  The reasoning used by Judge Kraemer to overturn Proposition 22 is squarely applicable to overturning the existing law against polygamist marriage, the law against incestral marriage, the law against marriage with children, the law against prostitution, the statutory rape law, and a host of the laws passed by the people and their representatives.

Can we as descendants of a people who had paid so dear a price to impose their collective will over their government through a democratic process for the first and only time in the long history of China in good conscience support an argument to curtail a power vested in the people of California without a compelling reason?  Can we as descendants of the lucky few Chinese who had the opportunity to escape the on-going Chinese civil war in good conscience support an argument to curtail a power vested in the people of California without a compelling reason when our cousins in China and Taiwan may still spill blood once again as a continuing price for the fact that our ancestors aspired to have such a power vested in the Chinese people in the Spring and Summer of 1919?

Even today, our fellow Americans are dying in Iraq and Afghanistan to secure for the people of Iraq and Afghanistan an opportunity to express their will directly.  Should we as attorneys at home support an argument to curtail the people's ability to directly participate in the political process without a compelling reason?

Regardless of how each of us individually feels about same-sex marriage, the fact remains that today in California, same-sex couples has practically all substantive rights heterosexual couples have, and they have the option of using the political process to address whatever grievance they have with respect to

2-5

Proposition 22.  In fact, Proposition 22 was just one governor's signature away from being rendered obsolete a mere a month ago.  Even as of today, Proposition 22 is just one general election away from being rendered obsolete if same-sex couples work to elect a governor who would sign the law making Proposition 22 obsolete. Should we support an argument to permanently weaken a right vested in the people of California, secured by centuries of installments of American blood and aspired with the lives of so many Chinese people, simply because some same-sex couples are impatient to have their psychological needs met.

In sum, it is my belief that if SCCALA were to take a position to the ongoing legal challenge to the law not recognizing same-sex marriage, it is more congruous with the cause of liberty, the interest of Chinese-Americans, the aspiration and struggle of all people with shared Chinese blood that SCCALA takes the position that the power reserved to the people under the American democracy be affirmed, rather than the position that the heterosexually-coupled white male drafters of the initial California Constitution were so wise that they anticipated the multiracial citizenry of future generations would be irresponsible in regulating marital relationship and social values that they intended the people of California to have no such police power.


Again, I welcome rebuttal argument from any one--and I have not received any from my first unsolicited arguments against signing on the amicus brief.

James Li


_____
Yahoo! Mail - PC Magazine Editors' Choice 2005
http://mail.yahoo.com

December 27, 2005 10:12 PM

Dear SCCALA Board Members,

I wish you all have a happy, prosperous new year.

I like to invite you to read Lockyer v. City and County of San Francisco (2004) 33 Cal 4th 1055 to find proof that the effort to constitutionalize gay marriage is a lost cause.  The portion of the opinion signed on by the unanimous court went out its way to distinguish the Hawaii case and the Vermont case to show that the Massachussette case is an anomaly, not a national trend, and to make clear that it will not ignore the dissent of three judges in the Massachussette court.  Justice Kennard—since her mother was Chinese and her legal education and initial phrase of her career was in Southern California, she could very well be a former SCCLA member—went even further, pointing out by deduction that it is settled that there is no right to gay marriage under the federal constitution.  I suspect Justice Kennard's opinion is the reason why there is not even an attempt to try to constitutionalize gay marriage on federal constitutional ground.  What is the chance that a court that outlawed unanimously affirmative action outreach by local governments four years ago will find a gay marriage exception to the police power of the people acting collectively?

I querry if all this hoopla over gay marriage is just a political ploy by Galvin Newsom to position himself to run for governorship in 2010.  I querry if Judge Kramer's decision is just an application for promotion by future-governor Newsom.  Only politics, not legal logics, can explain Judge Kramer's willful ignoring of the central purpose of the 14th Amendment equal protection clause—which the CA equal protection clause modeled after--and the reference to survival of humanity through procreation in both Perez v. Sharpe and Loving v. Virginia.  Judge Kramer's ruling that tradition is not a rational basis for the collective self-determination of the people is similarly a political ruling that defies longstanding legal principles and common sense.  What is so irrational about reliance on tradition in decision making?  The entire Anglo-American legal system has prospered through reliance and celebration of tradition, incorporated in the concept "stare decisis".  We rely on tradition in decision-making in everyday life.  Take SCCALA board meeting for example.  Every one knows that the center of Chinese community in Southern California had shifted into San Gabriel Valley twenty years ago, and yet SCCLA board still meets at Chinatown.  Why?  Because of tradition.  Reliance on tradition may not be wise or even correct, and may

2-7

even be regrettable, but it is certainly rational.

Even if we were to treat this effort to
constitutionalize gay marriage as a political
issue--aside from all the inherent legal problems and
the special moral problems for Chinese-American
lawyers this effort presents, it is just bad politics
for SCCLA to support this effort.  First, it will
fracture SCCALA.  I suspect that my views are shared
by the vast majority of those members who had
personally made the choice to vote for this country
with our feet, and Geoffrey's view is shared by the
vast majority of those members who have Christian
faith.  Second, supporting a lost cause will in the
end make all of us look silly, as second-class lawyers
who do not know the law.  Now that is a price worth
paying if we support a truly worthy cause, such as
one-man-one-vote in Hong Kong.  Curtailing the ability
of the people to participate directly in their
governance without a compelling reason, such as
defending the integrity of the outcome of as civil
war, is not a worthy cause at all:  it is civil wrong,
not civil right.  Third, SCCLA's supporting the effort
to constitutionalize gay marriage could potentially be
used to embarrass Justice Chin and Justice Kennard,
and harm ourselves professionally since presence of
two Chinese-Americans at the California Supreme Court
inevitably have salutary effect on all of us as
Chinese-American lawyers, particularly those of us
practicing law in the Chinese immigrant communities
and having to constantly battle the unwarranted
assumption among all immigrants that white lawyer are
naturally more effective.

Even if we were to take the cynical view that
Supreme Court judges respond to political pressure
more than to precedents, the outcome for
constitutionalizing gay marriage is even bleaker,
since six out of seven sitting CA Supreme Court
justices, Justice Chin and Justice Kennard included,
have been appointed by Republican governors.  SCCLA's
support for gay marriage is simply irrelevant to the
outcome, both legally and politically.  In fact, since
gay marriage has been hyped as a civil right movement
on the same legal and moral pedestal as interracial
marriage, and since Justice Kennard is a daughter of
interracial marriage of a Dutchman and a Chinese
woman, the Ca Supreme Court will probably assign
Justice Kennard to write the opinion ridiculing the
attempt to equate gay marriage with interracial
marriage in order to minimize the effectiveness of a
potential attack on the CA Supreme Court as anti-civil
right.  The only group that could potentially gain
politically from SCCLA's support of
constitutionalizing gay marriage are gay right
extremists, who then could use SCCLA's support to

ridicule Justice Chin and Justice Kennard as out of
touch with their own cultural community, traitors who
pull the civil right ladder after their own ascend.
Is this what we want, fracturing SCCLA, offending the
Chinese-American community and interests to support an
unworthy lost cause,  so that we all look silly as
incompetent lawyers, only to avail extremist groups a
weapon to ridicule our fellow Chinese American lawyers
serving in arguably the second most prestigious court
in the Union?  I think not.

  I am confident that in due time, my annoying
uninvited arguments against signing on the pro-gay
marriage amicus brief will be vindicated.  At the mean
time, I will go back to another politically unpopular
task of exposing racism in the Los Angeles County
Public Defender's Office.

Yours very truly,

James Li

---

Yahoo! DSL — Something to write home about.
Just $16.99/mo. or less.
dsl.yahoo.com

January 29, 2006 8:05 AM

Dear SCCLA Board members,

   Since we are now celebrating Chinese New Year, I like to submit a wish list as a general member and a person needing legal help:

1.   Do something about the false legal service advertising in Chinese communities that is unfair competition, impedes Chinese immigrants from getting quality legal service, and harms the reputation of the American judicial system.  10 years ago, it was brought up to the attention of SCCLA board of an ad featuring the photo of President Clinton and the owner of an immigration firm standing together, falsely suggesting 1) the owner is an attorney, 2) she is so accomplished that the U.S. President Clinton had to see her, 3) American legal process is so corrupt that outcome of legal service is influenced by which politicians one's attorney knows, and 4) she has special access to the biggest politician.  Nothing has ever been done.  If you read the Chinese language newspaper, magazine and yellow page, the problem has mushroomed, resulting in a total confusion among Chinese immigrants about nature of the American legal system and how to get good, quality legal service.


2.   Do more outreach to increase the diversity of the SCCLA board to increase SCCLA's capability reach out to Chinese immigrant communities and bilingual lawyers.  A decade ago, I heard the joke that SCCALA stood for Southern California Club of Abc LAwyers. Since then, a Taiwanese Lawyers' Association has been formed.   Unless SCCLA reinvigorates its ability to reach out bilingual lawyers, it is a matter of time that bilingual attorneys from China and Hong Kong will form their own separate associations, then the reality will imitate the joke.  SCCLA board is simply not internally diverse in light of the growing number of bilingual lawyers.  I am frankly surprised at how lonely the pro-Lockyer voices on gay marriage have been at SCCLA board, even though I have heard no less than 20 times the various versions of the joke that gay marriage is pro-Chinese because shattering the traditional American  definition of marriage  opens the door to resurrect the Chinese tradition of having multiple wives.

   Since SCCLA just got the diversity award from the state bar, shouldn't it do at least do what the state bar does with its committees to maximize the diversity of SCCLA board, such as frequent outreach to under-represented segments, or expanding the board temporarily from time to time so that it can both

achieve internal diversity and retain valuable board
experiences and benefit from institutional continuity?

Isn't it just a bit silly that in the vast majority
of SCCLA board meetings, the only ones who can read a
Chinese language newspaper are the waiters who serve
the food, when a vast majority of the neediest Chinese
living in Southern California can only speak Chinese
fluently?

If you think I am campaigning to get on the SCCLA
board in the future, that is right—that is my wish
#3.

As for wish #4, I hope that the First Circuit will not
pass down an opinion in the year of the Dog that makes
me feel like a dog.

Kung Hey Fat Choy!


James Li

_____

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

Tuesday, November 6, 2007 4:21 PM

SCCLA board of incoming-president-appointed governors,

First, I aknowledge that newspaper reporting often
distorts material information in the process.  Even in
today's Singtao article, my view was misstated
somewhat. .

Second, I hope that by making a private rebuttal now
to a purported charge against me, I will not need to
make the rebutal public.

I repeat my position here:  1) The SCCLA Board of
Governors is not a properly formed representative or
governance body;  2)Because of 1), SCCLA Board has no
authority to take a position on a controveral issue
on behalf of SCCLA without opportunity for general
members to approve it.

Here is the basis for my position in point 1).  SCCLA
bylaw states that members of the board of governors
are to be nominated by a committee of three.  I have
heard from multiple sources--including former and
current board members and former SCCLA
presidents--that for a long time, the practice has
been appointment of the incoming president.  My own
experiences confirm what I heard.  Two years ago, at
the same time I was volunteering 7 reasons why it
makes more sense for SCCLA to support affirming Prop
22, my application was rejected by [        ] alone.
Even in the process of giving me the bogus reason for
rejecting my application, he was acting in affirming
the practice of incoming president picking new board
members.

Well, there may be practical reason to give the
incoming president the privilege of selecting new
board members and rejecting applicants under false
pretense.  There are also pratical and governance
implications:  1)the board members owed their
allegiance not to the members but to current and past
presidents, 2)by abdicating the prescribed procedure
for selecting board members, the board also abdicates
the privilege at act on behalf of the entire SCCLA
membership.

If my application had not been rejected 2 years ago by
a method not authorized by the bylaw, I would probably
be a board member, and I would have reasserted my 7
unrebutted reasons for not signing on the amicus
brief.  I would also point out that not recognizing
same-sex marriage has far more consistence with the
current Chinese-American experience today than
Chinese-American experience one hundred years ago.  A
hundred years ago, it was a norm for married Chinese

4-1

men to have at least 2 wives;  it was very common for
female childs from poor families to be married to
adult males in wealthy families;  it was also common
for a male to marry his sister's daughter.  Today in
California, if a Chinese man marries 2 women, he is
guilty of felony of poligame;  if a Chinese man
married a child under age of 16, he is guilty of
statutory rape;  if a Chinese man married his
biological niece, he is guilty of incest.  Aside from
the overbearing relevance of the 14th Amendment, how
does that reality fit in the merit of the brief that
is purportedly signed on to by SCCLA?

With the wide spread use of e-mails, you could have
overcome the problem created by the practice of
incoming president picking new governors by simply
sending an e-mail to the general members to ask them
to confirm your decision to sign up that dubious
brief.  Why didn't you?

It is a great honor to all of us that two of the CA
Supreme Court justices are Chinese-American (I also
heard rumor that the Mexican-American justice also has
Chinese ancestry), but it also means that we need to
be more deliberate in taking position in controversial
issues.

James Li

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

4-2

Date: Sunday, July 19, 2009, 11:31 PM

Members, friends and supporters of SCCLA,

On the issue of overturning the will of the people with regard to the gay marriage law, the court documents suggest that Justice Chin had a collision of value with the Chinese-American lawyers of Southern California. But do you know the intolerance and falsehood behind SCCLA's purported support of overturning the will of the people? Judge [        ], a former SCCLA, is a witness to the first part of intolerance and falsehood described below.

In 2005, after SCCLA had been designated as the recipient of the state bar Diversity award, SCCLA was solicited to lend support to overturning Proposition 22. Immediately, one board member, A, began to point out a practical difference between race and sexual orientation. Some other board members began to treat him as intellectually incompetent, openly mocking A despite the apparent merit of A's point.

B, a bilingual former SCCLA scholarship recipient interested in serving on the board, seeing the condescending treatment of A by some SCCLA board members and after reading the opinion constitutionalizing interracial marriage, decided to come to A's aid by sending SCCLA board members e-mails ridiculing the arguments of comparing gay marriage and interracial marriage on LEGAL GROUNDS ULTIMATELY ADOPTED BY JUSTICE MING CHIN and questioning the claim that overturning Proposition 22 is in the interests of Chinese-Americans.

Apparently feeling the merits of B's points, Judge [        ] requested the incoming president [      ] to have B's e-mails printed out for consideration by board members along with the pitch from people soliciting SCCLA. [      ] did not do as requested. Perceiving that [        ] and SCCLA board members were inclined to give in to political consideration rather than genuine intellectual debate, B sent another e-mail articulating that it is bad politics for SCCLA to take a course of action likely to collide head on with the Chinese-American representation in the California Supreme Court.

As an ominous irony, while acting in the capacity of the incoming president of the reigning recipient of the state bar Diversity Award, [        ] did not appoint B to the SCCLA board even as A, the only voice openly opposing overturning Proposition 22 in the SCCLA board, was retiring from the board, and multiple board positions were available. How did [        ] communicate to B that B's application to SCCLA would be rejected? [      ] sent B an e-mail to ask B for his telephone number so that [        ] could call B and tell B over that phone that [        ] did not know B was interested in being appointed to SCCLA Board. If that was the true reason, couldn't he just state so in the e-mail?

That raises another issue. If the SCCLA board members had not been elected, and had been appointed by the incoming president, does the SCCLA board have authority to claim to a court that its view represents the view of SCCLA? Especially on the issue of proposition 22 after [        ] had used the appointment process to suppress an

intellectually argued dissension which [      ]'s predecessor, Judge Lu, had found meritorious.

The suppressed dissenting view also turned out to anticipate the court of appeal's opinion during [      ]'s presidency of SCCLA. But that did not prevent a falsehood being intentionally perpetrated against the California Supreme Court, causing an appearance that Justice Chin had a collision of values with Chinese-American lawyers of Southern California.

During the presidency of [        ]'s successor, [      ], an amicus brief to the California Supreme Court to support overturning the result of people's direct political participation purported to have the support of SCCLA. That was a falsehood. Ask SCCLA members if any of them ever received a ballot to vote for any board member or to vote for supporting the amicus brief overturning Proposition 22.

B, now a member of a state bar committee, raised the issue that since SCCLA board was composed by appointments of incoming presidents, a procedure not authorized by the SCCLA by-law, it was a falsehood for the document to purport that it had won the endorsement of SCCLA if in fact it had only the approval of a SCCLA board (of about a dozen lawyers) whose composition came about in part as a result [      ]'s suppression of views for upholding Proposition 22 by rejecting B's application. Did SCCLA board make any correction about the falsehood to the California Supreme Court had been pointed out?

If it did not, did the failure to correct a falsehood after its knowledge arise to the level of intentional misrepresentation?

Was there ratification by silence or inaction? No. The board members can tell you that throughout the remainder 2007, there was continuous protestation of the falsehood.

At the end, the public records give an impression that Justice Ming Chin had a collision of values of the Chinese-American lawyers of Southern California. But in fact, Justice Chin only had a collision of values of a dozen lawyers who chose to cave in to political pressure to perpetrate a falsehood rather than honor the duty of candor to the court.

Shouldn't we express our disapproval of the intolerance and falsehood by boycotting SCCLA?

5-2

Monday, December 21, 2009 3:15 PM


Dear Members of the SCCLA Advsiory Board, past SCCLA presidents, Current SCCLA leadership and board,

SCCLA is not abbreviation for Society of Crooked Chinese Lawyers of America. What the 2007 SCCLA leardership and SCCLA board did was crooked. Making a claim without fully disclosing material facts to pressure the California Supreme Court with two Chinese-American justices was crooked, even more so when nothing was done after the problem had been pointed out.
What was done was attempted fraud by concealment and omission. In light of Justice Kennard's decision to not even consider Prop.8, one only wonders whether Justice Kennard's intitial decision might have been influenced by seeing that Southern California Chinese Lawyers Association was a signatory to a brief comparing sexual orientation discrimination to race discrimination on the basis of the 1861 constitutional language.
What the 2007 SCCLA leadership and board did might actually have been a consumated fraud. If any one sues me for publicly accusing the 2007 SCCLA leadership and board of attempting to defraud the California Supreme Court, that will only embarrass SCCLA further.
What I ask to SCCLA to do is just something an honorable legal organization should do: Justice Chin did a very courageous thing in the face of overwhelming political pressure and potential of being labeled as a civil rights reactionary and should be honored by SCCLA, especially after the 2007 SCCLA leadership and board intentionally perpetrated a falsehood--apparently for political reason since a 1988 SCCLA scholarship recipient had stepped forward to point out seven problems associated with Chinese lawyers supporting overturning Prop. 22, rebutted only by rejection of his application to the SCCLA board.
If my generous peace offer is not accepted, members of the 2007 SCCLA leadership and board will regret it. I actually honestly think that [      ] is more suitable to be a judge than members of the 2007 SCCLA leadership and board who did nothing to show disapproval of the collective conduct.


James Li


5-3

Sunday, April 7, 2013 8:24 AM

Acquiring Political Advantage by Belittling African-American Legal Activity ("APABALA")

How about that joke for lawyers who studied US history through Cliff Note and law through commercial outline.

Friday, April 5, 2013 5:34 AM

Nat. Ass. Of Privileged Asian-Americans Belittling African-Americans (NAPABA)

How about this joke to remind people to not thumb their noses at Chinese-American CA Supreme Court justices, Chinese-American history, and Chinese-American communities.

Sunday, March 31, 2013 11:03 AM

Asians Patronizing Africans, Licking Caucasians ("APALC")

How is that a joke for embracing one white man's speculation while rejecting a million people's.

Monday, March 4, 2013 10:33 AM

[      ], why is ok for a white man to speculate, but not for black men, about gay marriage?

Ladies and gentlemen,
Over the weekend, I found out once again that APALC thumbed its nose at the Chinese-American communities, the Chinese-American experience, and California Chinese-American Supreme Court justices. So I read that brief signed on by APALC and NAPABA—which Ms. Chang presumably will preside one day, and found a brief that was at least one intellectual notch below the one authored by APACL and signed on by outstanding lawyers. Read it for yourself. It is all sociological speculation based upon huge leaps of faith and logic based upon annedotes and limited-scope studies.
When you meet [      ], why not ask him this: If it is OK for a white man to speculate about gay marriage on the basis of think scholarship and annodotes, why is it not OK for black men to speculate about it on the basis their own life experiences?
At least the brief that APALC wrote—at the expense of $100k supporters' donation?—had the virtue of arguing that no one should act on speculation when it comes to gay marriage.

6

# THE STATE BAR OF CALIFORNIA

## APPLICATION FOR 2014 – 2015 APPOINTMENTS

**Your application is confidential.** You may apply to up to three committees, but can only be appointed to one. A separate application must be submitted for each committee to which you apply. If you are not appointed to a committee of your choice, your application may be circulated to other committees if you so authorize. Review the requirements for each committee at the State Bar's website. Committee requirements are also available from the State Bar's Appointments Office and committee staff. You will be notified by letter of the decision on your application no later than 9/14/2014. Your notification letter will be mailed to your State Bar public address of record. Terms for most committees begin at the close of the 2014 State Bar Annual Meeting (9/14/2014); terms for the American Bar Association (ABA) House of Delegates begin at the close of the 2014 ABA Annual Meeting (8/12/2014); the Judicial Council terms begins 9/15/2014; the Lawyer Assistance Program (LAP) Oversight Committee terms begin 1/1/2015; and terms for the 2015 Judicial Nominees Evaluation (JNE) Commission begin 2/1/2015.

| Office Use Only-3A Processed: |
|---|

**Instructions.** Fill in on your computer using the fillable text boxes, or complete by hand using a pen with dark ink or by typewriter. Print a copy of the completed application. Date and sign the application. Attach: 1) statement of interest indicating why you wish to serve on the committee and what you can contribute, 2) resume or biography, and 3) any letters of recommendation (maximum three). Do not submit copies of books, articles or certificates with your application. Follow filing instructions at the end of this form.

### PART ONE

**NAME:  James Li**                                    **STATE BAR NUMBER:   176662**

**CHECK HERE IF YOU ARE NOT ADMITTED TO PRACTICE LAW IN CALIFORNIA:** ☐ If you are not a lawyer and/or are not admitted to practice law in California, you may apply for some positions as a public member. Some committees require public members to be non-lawyers. Please review the committee descriptions at the State Bar website for requirements. If appointed, your address information may be published at the State Bar's website. If you do not wish your e-mail address to be public, check the "private" box at the e-mail address line below.

**NAME OF COMMITTEE:** Names of the committees appear in the selection boxes below. In this section, select the name of the committee for this application only. Review the names of the committees in the selection boxes and click on the name of the committee. If you make a mistake, click the blank space at top of list. If the committee's name is not listed, type the name in the last box. If you are applying to more than one committee, complete the Committee Preferences section below.

**Professional Responsibility  Conduct (COPRAC)**

**COMMITTEE PREFERENCES:** You may apply to a maximum of three committees but must list them in your order of preference below. Click the selection boxes to find the committee that is your first choice, second choice, or third choice. You must submit a separate application for each committee and your order of preferences must be the same on each application.

**1st choice:**      Professional Responsibility  Conduct (COPRAC)

**2nd choice:**                      Council on Access  Fairness

**3rd choice:**      Administration of Justice

If you are not selected for one of these committees and would like to be considered for a position on another State Bar committee, please check here:  ☐

**EMPLOYER / FIRM / AGENCY:  Law Offices of James Li**

**MAILING ADDRESS/ STREET ADDRESS:**  P.O. Box 5399

**CITY / ZIP CODE:**  Buena Park  90622

**DAYTIME PHONE:** ( 626) 322-5039  **FAX NUMBER:** ( 626) 628-3079

**E-MAIL ADDRESS:  lawofficeofjamesli@yahoo.com**

My e-mail is public ☒    My e-mail is private ☐

THE STATE BAR OF CALIFORNIA                                    Page 2

Application for 2014–2015 Appointments

---

**HOW DID YOU LEARN OF THIS VACANCY?** *(click on one box; fill in name if requested; tab to next question)*

☐ Board of Trustees *(name):*            ☐ Local bar association
☐ Committee chair                        ☒ State Bar publication or State Bar website
☐ Colleague                              ☐ Other *(specify):*

---

**WHICH ONE OF THE FOLLOWING BEST DESCRIBES YOUR OCCUPATION?** *(click on one box; fill in name if requested tab to next question)*

☒ Private practice                       ☐ Non-governmental legal services organization
☐ Publicly employed lawyer               ☐ Non-profit organization
☐ Corporate law department               ☐ Retired justice or judge
☐ Law teaching                           ☐ Retired lawyer
☐ Quasi-judicial officer                 ☐ Other *(specify):*

---

**WHAT IS THE SIZE OF YOUR OFFICE?** *(click on one box; tab to next question)*

☒ Sole practitioner                      ☐ 36-100 lawyer office
☐ 2-10 lawyer office                     ☐ 101+ lawyer office
☐ 11-35 lawyer office                    ☐ Not applicable

---

**LIST DATE ADMITTED TO THE STATE BAR OF CALIFORNIA** *(month and year):*   **05/1995**

I am currently (check one):  ☒ Active    ☐ Inactive

List other jurisdictions to which you have been admitted to practice:

---

**LIST LENGTH OF TIME IN PRACTICE:   18 years**

If not a lawyer, list length of time in profession:

---

**LIST FIELDS IN WHICH YOU PRACTICE:  General Practice**

**LIST FIELDS IN WHICH YOU ARE CERTIFIED AS A SPECIALIST** *(Lawyer applicants to the legal specialization entities, except Admiralty/Maritime Law and Legal Malpractice Law, must be certified specialists):*

---

**VOLUNTEER SERVICE.** List prior volunteer service with the State Bar, local or specialty bar associations, community or other organizations. Please focus on those activities that prepare you for a position on the committees to which you are applying:

In the past decade, I volunteered to persuade the Chinese American legal community that Justice Chin's opinion on Proposition 22 is the better view of the law on same-sex marriages, resulting in a general retreat by affinity bar associations with large ethnic Chinese-American presence from attacking Proposition 8 and the current spreading of Justice Chin's view across Chinese-American legal community outside Southern California.  I volunteered one year before law school, two years during UCLA Law School, and three years after law school to address issues relating to opportunities for disadvantaged individuals' in disadvantaged communities, resulting in far-reaching impact still gradually unfolding.  In the past two years, I defended, thus far successfully, State Bar disciplinary charges against an attorney of color who had overcome severe social and economic disadvantages to become an attorney and has made great contribution to the legal profession and Chinese immigrant communities in California.  (Because I come from a very disadvantaged background and my opportunity to practice law is result of many people struggling against the effects of social and economic injustices, I consider helping myself was and is itself voluntary service to a disadvantaged community)  From 2006 to 2009, I volunteered as a member of the State Bar Standing Committee on Delivery of Legal Service.

7 - 2

THE STATE BAR OF CALIFORNIA                                         Page 2

Application for 2014–2015 Appointments

---

**STATE BAR SECTIONS.** List the State Bar sections of which you are a member (*all applicants to a section's executive committee must be members of that section*):

---

**DISCIPLINE RECORD.** List any formal disciplinary charges filed against you, including disposition of such charges and any public record of discipline:   **State Bar Court Docket No. 11-O14430 and 11-O-17550 for alleged violation of Business and Professions Code sections 6068(a), 6068(c), 6068(d), 6068(g), 6106;  Rules of Professional Conduct, rules 3-300, 3-310(C)(2), 3-700(D)(2), 4-100(A), 4-200(A), 4-200.  No decision has been rendered, after records having been re-opened as a result of suspicious post-trial conducts of the principal complaining former client and his attorney.  (As a part of my defense, I argued that if the State Bar disciplines me for what I did not do, the State Bar should also discipline former Attorney General Jerry Brown and Attorney General Kamala Harris for what they did not do.)**

THE STATE BAR OF CALIFORNIA                                      Page 3

Application for 2014–2015 Appointments

## PART TWO

The State Bar of California values diversity and broad-based representation in its appointments. The legal community is diverse and it serves an even more heterogeneous population. The recruitment and selection of applicants with diverse backgrounds, experiences, outlooks, and ideas will bring qualities essential to the governance of the legal profession and to the services the State Bar provides to its diverse members and to the public. It is therefore the policy of the State Bar's Board of Trustees to encourage the participation of all State Bar members in order to obtain broad representation on each entity. To the extent available, the State Bar will consider factors which encourage breadth and depth of perspective including, but not limited to, the following: geographic location of residence and work, practice area, size of law practice, length of time practicing, volunteer work, specific accomplishments, educational background, ethnicity, gender, age, sexual orientation, and disability. The State Bar provides equal access to all applicants and complies with all applicable anti-discrimination laws in its appointment process.

**Please complete the following portion of the Appointment Application** to let us know how you can contribute to the diversity and broad composition of the State Bar's committees and commissions:

What unique characteristics, perceptions, experiences, personal talents, or qualifications would you bring to the committee? **As a teenager, I fought a civil rights battle, with many unsung behind-the-scene heroes, with unfolding salutary effects on the California Chinese-American community and possibly beyond it. That civil rights battle had factual characteristics similar to the facts of African-American and Chinese-American civil rights struggles that appear in the most influential American civil rights law cases. The immediate reward of that civil rights battle was my acquisition of the ability to speak, read, and write English, and the long term reward is my ability to practice law in California and apparently have become one of the most influential civil rights voice in the Chinese American legal community. (See the section on hardship and disadvantage below for details.) I have spent my life time to honor the experiences that enabled me to fight and win that battle and expand its rewards. (I consider that effort to be a service in the public interest.) That battle's most salutary effect to the Chinese-American community is my ability to turn many community activists in California Chinese-American community from being perceived by many Chinese-American lawyers as narrow-minded "bigots" into community heroes by laying down the intellectual and moral arguments that it is more congruous to the Chinese-American experience to embrace the intrinsic values of ordinary people's right to vote, especially African-Americans', than the speculative net social benefits of same-sex couples' right to marry.**

**I never had the opportunity to graduate from elementary school or attend high school beyond 9th grade. With the help of affirmative action, public financial aid, and public education system, I overcame the institutional barriers for a homeless teenager to enter the legal profession--after making dramatic individualized modifications to the public education opportunities available to me. After graduating from UCLA and passing the bar on my 4th try, I have primarily been in solo practice, as a result of adjusting to the reality of institutional barriers for a person born into poverty to gain salaried employment in the legal profession, even in the era of celebrating and embracing diversity. Solo practice, however, has afforded me the freedom to speak up on my conscience in the face of adverse political trends, and that freedom has enabled me to become arguably one of the most influential attorneys in the Southern California Chinese immigrant community. As a result of this extraordinary journey, I have personal knowledge of the barriers throughout life making it pratically impossible for a person born into a poor family in a disadvantaged community to enter into the legal profession and remain available for legal service to the disadvantaged community. Just as signifcantly, in this journey, I have gained much knowledge not taught in law school about how the law affects the poor, how the poor perceive the law, and how profession rules affect delivery of legal service to low-income and middle-income families.**

7 - 4

Also from this journey, I have identified some practical techniques to minimize the effects of some of those barriers that could be useful to disadvantaged individuals who wish to enter the legal profession.  (I am inserting apparently disjointed information because I am applying for 3 different appointments at the same time.)

As an attorney, I have never had to pay a penny in legal malpractice or sanction.  However, my effort to maintain a financially viable solo practice through not spending money on legal malpractice insurance has contributed to the need to devote the past 3 years to defend false allegations by disappointed former clients who accused me of wrongdoing with the benefits of hindsights, including one who defrauded me into pushing his falsehood in court and then sued me unsuccessfully for a shake-down, triggering the current State Bar disciplinary proceeding against me.  I have defended my honor--and the honor of the experiences that led me from an elementary school drop-out to arguably one of the most influential Asian American civil rights voice in America--rigorousely and thus far successfully.  In this process of establishing my solo practice servicing primarily low-income and middle-income individuals and families and then having to defend it, I have also gained signficant knowledge of the challenges faced by an attorney from a disadvantaged background in establishing and maintaining a solo law practice to low-income and middle-income individuals.

From my life experiences, I also have knowledge of the perceptions about legal service by and legal needs in low-income and middle-income individuals and families not taught in law school, at least not at UCLA Law School.

As an attorney, I have demonstrated a person of color from a disadvantaged background, subject to negative stereotypes fueled in part by national and international politics, can think independently and make great contribution to the legal profession and the evolution of even the Constitutional law.  Long before California Supreme Court's decision on Proposition 22, I articulated the support for its legality not different from that in the opinion signed on by Justice Chin.  I also anticipated California Supreme Court's upholding Proposition 8 and ruling on the standing issue in relation to the subsequent challenge to Proposition 8's constitutionality in federal court.  Additionally, I single-handedly persuaded Southern California Chinese Lawyers' Association to retreat from attacking Proposition 8 as unconstitutional--while under the shadow of State Bar accusation of moral turpitude and disciplinary proceeding.  In addition to relying on legal positions in the opinion signed by Justice Chin, I presented cultural and moral arguments with such strength that other Southern California Asian bar associations with strong ethnic Chinese presence also retreated from attacking Proposition 8.  I have openly challenged the entire Asian-American legal community to reconsider Proposition 8's legality by asking the rhetorical question, "Where is the evidence that Asian-Americans ever complained about marriage restriction [before riding on the coattail of African-Americans' civil rights mobilization]?"

In my defense of the disciplinary charges against me, I also discovered that for a solo practitioner, a mere notice of disciplinary charge is in reality a demand to suspend his or her law practice.  In my case, the mere potential prospect for notifying clients about a suspension made it imprudent for me to spend time or money to advertise for new clients.  I was almost talked into taking a easy way out by a State Bar judge through taking a 3-month acutal suspension deal, but chose to fight to defend the honor of those experiences that enabled me to go from an elementary school drop-out to an American attorney.   If I knew it would take more than 9 months for the judge's decision, I would plan my law practice differently during this time.  The practical effect on my law practice

THE STATE BAR OF CALIFORNIA                                                    Page 5

Application for 2014–2015 Appointments

**for not pleading to culpability has been nearly one year not being able to make my service available to the Chinese immigrant community.**

Please describe the communication skills and leadership abilities that you possess that will lend to the activities of the committee:  **I presented such a rigorous defense of myself against disciplinary charges levelled against me that the State Bar judge has not been able to make a decision 9 months after initial closing of evidence.  That evidences the maturity of my communication skills.**

**My backgrounds have also afforded me leadership ability to address controversial issues other people might not be able to.  When gay members in Southern California Chinese Lawyers' Association's (SCCLA) leadership tried to embarrass me over my view on the legality of Proposition 22 and Proposition 8, I triggered their resignation from the track of becoming future SCCLA presidents by just asking the question, "Calling a civil rights hero a jackass?".  Similarly, when I ran for office in student government at UCLA on a platform that disadvantaged students could benefit from more balanced presentation of capitalism and experiences of western democracies, I ended all negative speculations about me with a brief description of my elementary school drop-out experience and the sentence "James picked up his understanding of humanities and social sciences by standing up to prejudice, injustice and oppression with confident defiance".**

**In my journey to become an attorney, I encountered many interpersonal conflicts, my ability to persuade others to compromise and move beyond those conflicts contributed to my ability to overcome the many barriers for a disadvantaged individual to enter the legal profession, and now marginally arguably the 5th most influential civil rights voice in the California Asian-American legal community on current civil rights issues--after the four Asian-American lawyers serving in the California Supreme Court.**

Please describe any hardship or disadvantage you have had to overcome and how this experience will contribute to your service with the State Bar:    The hardships and disadvantages that I had overcome are distant from the lives of at least 99.9% of attorneys--and that might explain my inability to find salaried employment despite having a UCLA Law degree and my bilingual, multi-cultural capacities in an era of celebrating diversity.  Let me explain how I was delivered into and fought a civil rights battle with characteristics similar to those fought by African-Americans that awoke America's collective conscience and are required case studies in American law school.  35 years ago, when the U.S. re-established relationship with China, my family was among the very first group of direct lineal descendents of American citizens to be permitted to immigrate to U.S. on family unification ground.  At that time, we were all instructed to move to Hong Kong, then a British colony, upon prima facie showing of being direct lineal descendent of a U.S. citizen, presumably under some reciprocal treaties with Britain(--purportedly, Japan bombed Pearl Harbor 8 hours before attacking Hong Kong out of belief that America had a treaty obligation  with Britain at that time to defend British colonies in East Asia).  Presumably, the Carter administration would not sign any treaty or approve any treaty interpreation that would subject Chinese-American descendents to second-class resident treatment (I have publicly requested within SCCLA any one with connection to Rep. Judy Chu to check if this presumption was wrong).  Second-class resident treatment was what I and other similarly situated children received, perhaps as a result of administrative snafu by local British administrative authority, or a political choice out of concern for possible instability of treating two groups of Chinese residents differently, rather than an intentional snub at U.S., which subsidized Britain's defense, with a quarterly arrival of a U.S. naval armada.  I attempted to enroll in a public school, but was turned away on the ground of not being able to follow English instruction, the typical treatment for immigrant children from China, tinged with negative stereotypes about the Chinese communist education system and its effects on children having received education through it..  I responded to that situation, directly linked to a century-old British House of Lords ruling that implicit in any imperial conquest was the ability by the local British authority to discriminate on the basis of national origin, by learning English on my own.  I believe now that if a lawyer would step forward and assert that treaty with the US obligated British authority to treat me and other similarly situated children as honorary British citizens, that argument would easily prevail, at the minimum on fiduciary duty grounds even if there was no explicit treaty language on treatment of Chinese-American descendents.  (Ironically, in the ongoing disciplinary proceeding against me, the State Bar asks for my disbarment on ground of alleged breach of fiduciary duties to my clients and bankruptcy court, and I retorted with the point that the State Bar should disbar former Attorney General Jerry Brown and current Attorney General Kamala Harris for breaching their fiduciary duty to the people of California as well.)  Since no such an attorney stepped forward, I

7 - 6

THE STATE BAR OF CALIFORNIA                                                          Page 6

Application for 2014–2015 Appointments

had to mitigate the effects of lawful race discrimination on my own, building upon skeletal knowledge of English to self-educate myself on the English language through listening to the radio and used English lesson text books.  As a result of that experience, I have a very personal identification of African-Americans' struggle to integrate public schools in this country and their defiance at Jim Crow laws.  Also as a result of that experience, I felt compelled to step forward to question the intellectual honesty of comparing sexual orientation discrimination to race discrimination on either California Constitution or U.S. Constitution grounds.  For me, the difference between the two types of discrimination are real and substantial.  As an illustration, a gay person can escape sexual orientation discrimination by just not talking about it, whereas a black person does not have that choice.

My effort to learn English on my own paid off.  After staying in Hong Kong for nearly two years, my family and I could finally immigrate to the U.S. to reunite with my grandmother.  But economic reality caused my family to break up, with me living with my father in Annapolis, Maryland because he found a minimum-wage job there.  After 7 months, I moved to California to live with my mom as she had found work as a domestic worker for a relative.  During the time, I realized that minimum wage law was meaningless to new immigrants from China working at low skill jobs because employers worked them so long or employed them under the guise of independent contracting that their actual wages were about 1/3 to 2/3 of the legal minimum wage.  I was able to catch up with my work in school relatively quickly, becoming a straight-A student.  However, negative stereotypes about immigrants from China caused my mother a lot of mental stress at her work, to the point of thinking about committing suicide.  In an effort to relieve my mom from enduring the mental abuse, I decided to end my education by taking the California High School Equivalency test, so that I would be able to find full-time employment working some place with real minimum wage without the employer violating some anti-truancy law .  Upon passing the California High School Equivalency Test, I persuaded my mom to quit her job to end the daily mental abuse she was subject to.  A direct result of my mom quitting her job was that my sister and I became homeless.  We coped with that situation by living in a used car and occassionally at friends' homes for temporary shelters.  During this time, I was able to complete the remainder of my 9th grade work with straight-As.  At the mean time, I became aware of a local university of having special admission program for disadvantaged students.  I took the SAT, and was able to be admitted through EOP (Extended Opportunity Program or Equal Opportunity Program) on the strength of my SAT score and 9th grade record, apparently after an administrative committee decided thatsince I had passed the California High School Equivalency test, my 9th grade record should be treated the same as 10th or 11th grade record, and overturned an initial denial because my SAT score was short of being admitted entirely on the basis of test scores alone.

During college, my priority was to honor being given an extended opportunity for education by finishing the engineering program in 4 years and provide support for my family, rather than getting admitted to law school.  My lack of knowledge of actual employment practice by employers caused me to make the decision of trying to absorb as much information at the expense of getting good grades.  The fact that I had to figure out how to build up a support system for my education also contributed to my inability to get good grades, resulting in my need for likely one of the largest diversity preferences ever to get admitted into UCLA Law School.

At UCLA Law School, in term of ability to get good grades, all the disadvantages in my life caught up on me.  I quickly realized how well I would end up would affect future opportunities for other disadvantaged students to get admitted to UCLA Law School.  Accordingly, I addressed realisticly challenges unique to very disadvantaged students like myself, and modified my law study program and progress to insure that I would graduate from UCLA Law School with the ability to do works meeting expectation the legal community has for a graduate of UCLA Law School.  I did a lot of addiitonal work on my own, and I am not embarrasseed to claim that additional work as a project to advance public interest since my ability to perform in the future would affect educational opportunities for other disadvantaged students from disadvantaged communities.  When I was at UCLA, I openly expressed perspectives that challenged assumptions about the poor and the disadvantaged, such as arguing that the spread of capitalism and pluralistic values under the British Empire improved the lots of the poor and the disadvantaged, and supported them with historical evidences, contributing to UCLA Law School's public adoption after Proposition 209 (outlawing preference based upon race, sex, or ethnicity) that it would give special emphasis to student body diversity arising from social and economic disadvantages.  I attribute much of my present ability to influence other attorneys' view about evolution of the U.S. Constitutional law to the extra work I did between getting admitted to UCLA Law School and passing the bar.

After UCLA Law School and passing the bar, I had a very hard time finding salaried employment, likely a result of assumption about a person needing 5 years to finish law school and 4 attempts to pass the bar and negative stereotypes about first-generation Asian-Americans, such as inability to apply the English language effectively in a legal setting.  Self-employment was the only practical option for me to contriubte with my UCLA Law School education.  Since then, I have become a relatively influential Chinese-American attoneys in this country, after having stepped forth to challenge, with some but increasing success within the Chinese-American legal community, the legal, intellectual, and moral  foundation for overturning Proposition 8.  (My success within the Southern California Chinese-American legal community at criticizing the decision to overturn Proposition 8 might have contributed to the $1800/hour Mr. Olson's plea for President Obama to weigh

7 - 7

THE STATE BAR OF CALIFORNIA
<span>Page 7</span>

Application for 2014–2015 Appointments

in on Proposition 8's constitutionality, because former U.S. Attorney, Chinese-American attorney Debra Wong Yang, is a law partner to Mr. Olson.)  This leads to an idea I have for increasing diversity in the legal profession:  educating legal profession employers that overcoming disadvantage is itself an indication of ability and a form of community service.  Those who work in disadvantaged communities can attest to the fact that when a disadvantaged person in a disadvantaged community does well, that has both immediate and long-term salutary ripple effects that could not be bought through hiring more police and building more prisons.

My commitment to do work for the public interest also impelled me to step forward to challenge the assumptions that Southern California Chinese-American lawyers initially had on the issue of legality of the law regulating same-sex relationship.  I believe that Justice Chin's view to be a better view, more congruous to the concept of ordered liberty in a democratic society, and my intellect, bilingual ability (I found a lot of cultural support for my arguments from Chinese language documentaries produced in China, Taiwan and Hong Kong) and unusual life experiences have contributed to my ability to change the view of many prominent Chinese-American attorneys.

Is there any additional information about yourself that you would like to share with us?   In the process of persuading other Chinese-American attorneys to retreat from attacking Proposition 8, I documented an aspect of the Chinese-American experience that had either been forgotten or overlooked, with the Oregon Chinese-American community--in which Justice Chin grew up--leading the way:  Chinese-Americans mobilized for a sustained period of time 80 years ago, practically involving every Chinese-American family, to support people's will on a social issue--Chinese people's will that  China not become Japan's India.  I also supported my arguments by pointing out that Chinese-Americans willingly abandoned many marital relationships acceptable in traditional Chinese society, such as polygamy, ability to marry one's niece, and ability to marry children.  I challenged Chinese-American politicians (including Rep. Judy Chu, with her large bilingual staff and unique access to the Library of Congress), academics and lawyers to find evidence of Chinese-Americans ever complaining about marriage restriction before the civil rights era triggered by African-Americans' political mobilization, and  no such evidence has surfaced--and during this time, I found evidence of Chinese-American leaders in Mississippi of actively discouraging interracial relationship between Chinese men and African-American women during the Jim Crow era, though the anti-miscegenation law there permitted marriage between Chinese and African-Americans.  Privately within the Southern California Chinese-American legal community, I have coined the word "ROBbeory" (stringing together the words "Rhinehardt Olson Boise's bad theory") to remind Chinese-American attorneys of my point--gaining momentum at least with Chinese-American attorneys serving in the Chinese immigrant communities--that the decision to invalidate Proposition 8 has cost ordinary people of some part of the rights many Chinese people died just to have a limited taste of.  Of course, my point here is not to change any one's view on Proposition 8, but to demonstrate that a disadvantaged person from a disadvantaged community can make great contribution to the legal profession after being given a chance at public legal education, such as seeing issues that  eluded privileged white males such as the $1800/hour Ted Olson and the $5,000,000/year David Boise.  I understand the arguments to respect sexual orientation and same-sex relation, but think that it is wrong for the judiciary to resolve the issues arising from them, rather than letting the democratic process to resolve those issues, especially in light of the political clout of the gay community.

Because of my life experience with injustice, poverty and different kinds of hardship, I have witnessed the effects of religion and views about sex on the poor, especially children lacking parental affection and guidance, in ways that most attorneys simply do not know because attorneys' upbringings are usually distant from the lives and struggles of the poor and the disadvantaged.  Despite of that fact, and indeed because of it, my effort to persuade other Chinese-American attorneys to retreat from attacking  Proposition 8 focused entirely on analysis based up legal text and cases and their historical origins and on historical facts of the Chinese-American experience.

Much of my growing up from a boy to a man was without parental affection and guidance, not as a result of my parents' character but as a result of their losing those abilities through circumstances beyond their control.  I made many cross-road decisions in my adolescence on the basis of my perception of societal moral approval and disapproval of certain choices.  Based on my observation, that is the experience common (and I speculate that the word "universal" is not a far reach) to children growing up without parental affection and guidance.  I seriously question if  this ongoing Constitutional doctrine that community moral disapproval is not a rational basis for law making is the result of U.S. Supreme Court justices with life experiences limited to experiences distant from the struggle of the poor and the disadvantaged, especially disadvantaged children.  For me, it is just common-sensical that that if a moral disapproval does not correlate to some actual benefits in people's lives, it will over time be abandoned by the majority of the people.  In my first successful effort to disuade Southern California Chinese Lawyers Association ("SCCLA") from joining the attack on Proposition 22 when it was a state court of appeal case 8 years ago, I openly expressed that community notion of morality was sufficient rational basis for legislation--and that was just one of the 8 reasons I articulated for SCCLA to not getting on the bandwagon to attack Proposition 22.  Based on my life experiences, common with Judge Walker, Judge Rhinehardt and Justice Kennedy only to the extent that I attended a prestigious law school and have become a lawyer, I see a lot of benefit to disadvantaged children and

<span>7 - 8</span>

THE STATE BAR OF CALIFORNIA                                                    Page 8

Application for 2014–2015 Appointments

disadvantaged communities from moral disapproval of homosexuality. As a concret example, at the very minimum, when a boy without the protection of an adult, as I once was, is bullied, as I was frequently subject to as a teenager immigrant from a communist country, he is less likely to be forced into homosexual activities that might have far reaching health and economic consequences beyond his family's ability to cope. In the same line of reasoning, since sexual activities some times spread disease and society has a responsibility to provide health care to the needy, society has a legitimate interest in discouraging conducts that might fasten spread of disease to the poor. My point here is to give an example of how a person from a disadvantaged background might rationally view issues differently, rather than changing any one's mind on a legal or political issue.

---

Applicants are requested, but not required, to provide the following information. If you wish to self-identify as a member of a community or to describe your background, please complete the following:

Gender:  Male

Sexual Orientation (e.g., do you self-identify as a member of the gay, lesbian, bisexual or transgender community):

Ethnicity: Chinese

Other Diversity Factor(s):
Fluent in Chinese.

Age: 47

---

SIGNATURE:  Sign and date your application.

Signature: _____          Date: _____11/25/13_____

## Statement of Interest

I am interested in serving on the Committee on Professional Responsibility and Conducts because I have first-hand knowledge of how important legal professionalism is to lives of the poor and the disadvantaged and how professional conduct rules and the disciplinary process affect solo practitioners, especially those involving in providing legal service to immigrant communities where English is not the primary language.   My answer to the form application describes the sources for the first-hand knowledge.  I have in fact become expert of professional responsibilities and conducts and their enforcement to a deeper level than most lawyers as a direct result of having had to respond to disciplinary charges leveled against me largely as a result of disappointed former clients who changed their views of occurrences after hindsight.

I am interested in serving in the Council on Access and Fairness because I have a first-hand experience of how challenging it is for a disadvantaged person from a disadvantaged community to enter the legal profession.   My answer to the form application describes the sources for the first-hand knowledge:   I never had the opportunity to graduate from elementary school or attend high school for one day beyond 9th grade;  I have had a solo law practice in large part because I could not find salaried employment.  From my own life experiences, I also have first-hand knowledge about barriers for the poor to gain access to legal service and for attorneys with ability to facilitate such service to provide such service.  As an example, in order to contribute as an attorney, I catered my law practice to low-income and middle-income individuals, and in order to make my practice financial viable, I relied on my competence as substitute for malpractice insurance, resulting in having to defend shake-down by a former client on my own, resulting in having to suspend my law practice for 2 years to defend disciplinary charges based upon complaints motivated by opposing lawyers in the civil case wishing to gain litigation advantaged.

I am interested in serving in the Committee on Administration of Justice because I have first-hand experiences of how the law affects the poor and how the poor perceive the law.  I experienced one of greatest social injustices in Chinese-American history during the presidency of a living Nobel Peace Prize-winning American president, and that could easily have been ended by an attorney making a classical legal argument in court.  I have turned that experience into a driving force for me to become one of the most influential civil rights voices in the Asian-American legal community—while under public knowledge being disciplined for alleged breach of fiduciary duties to my clients and to the court.   My answer to the form application describes those experiences in detail.

As a statement applicable to all three committees, I am interested in serving in a State Bar committee or council because I can facilitate the State Bar's most important mission:  improving quality of justice for all people.

Resume

## Most Significant Professional Achievement

Successfully persuaded Southern California Chinese Lawyers Association to retreat from attacking Proposition 8.

## Most Significant Personal Achievement

Successfully waged one of the greatest civil rights battles by a living Chinese-American after dropping out of elementary school.

Because the form application provides for opportunity for me to describe my life experiences and professional achievements in detail, I incorporate the answers to the topics there as a part of my resume, rather than having two documents about the same topics.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☑ )

James Li

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Wendy Chang, Cynthia Loo, Does 1-10

**(b)** County of Residence of First Listed Plaintiff   Orange
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☑ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☑ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**  According to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 USC 1983, 1988, violation of freedom of speech and freedom of religion.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☑ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☑ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☑ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☑ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:

SACV16-609-

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
|  | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | | |
|---|---|---|
| ☐ Yes  ☒ No | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|  |  | ☐ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
|  |  | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | | |
|---|---|---|
| ☐ Yes  ☒ No | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|  |  | ☐ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
|  |  | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☒ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☒ Yes   ☐ No | ☐ Yes   ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E,  below. |
| If "no," go to question D2 to the right. ➡ | If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | Southern Division |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☐ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**    ☑ NO    ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**    ☐ NO    ☑ YES

If yes, list case number(s):     N/A

Civil cases are related when they (check all that apply):

☑ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**                      DATE:    4/1/16

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |